UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **TOM PAYNE**, | Case Number 1:12 CV 2637 |
| Plaintiff, | |
| | Magistrate Judge James R. Knepp II |
| v. | |
| **COMMISSIONER OF SOCIAL SECURITY**, | MEMORANDUM OPINION AND ORDER |
| Defendant. | |

### INTRODUCTION

Plaintiff Tom Payne seeks judicial review of the Defendant Commissioner of Social Security's decision to deny disability insurance benefits (DIB). The district court has jurisdiction over this case under 42 U.S.C. §§ 1383(c)(3) and 405(g). The parties have consented to the exercise of jurisdiction by the undersigned in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 17). For the reasons given below, the Court affirms in part and remands in part the Commissioner's decision denying benefits.

### PROCEDURAL HISTORY

On January 2, 2008, Plaintiff filed for DIB alleging disability beginning August 11, 2006. (Tr. 91, 162-64). Plaintiff's claim was denied initially and on reconsideration because he was engaged in substantial gainful activity (SGA). (Tr. 92-93, 96-99). At Plaintiff's written request, a hearing was held on January 5, 2009 before an Administrative Law Judge (ALJ). (Tr. 87). The ALJ determined Plaintiff's work had been accommodated, therefore he had not engaged in SGA and remanded the claim to the Ohio Bureau of Disability Determination. (Tr. 87).

On remand, Plaintiff's claim was denied initially and on reconsideration. (Tr. 100-08, 110-16). At Plaintiff's request, a second hearing before an ALJ was held on March 1, 2011. (Tr.

32-84). The ALJ issued an unfavorable decision and the appeals council denied Plaintiff's request for review, making the ALJ's decision the final determination of the Commissioner. (Tr. 1-5); 20 C.F.R. §§ 404.955, 404.981, 416.1455, 1481. On October 22, 2012, Plaintiff filed the instant case. (Doc. 1).

## FACTUAL BACKGROUND

*Plaintiff's Vocational and Personal Background*

Plaintiff was 57 years old and worked for Buckeye Metals Company (Buckeye Metals) on April 4, 2011, the date of the ALJ's decision. (Tr. 40, 87, 192). Plaintiff's work had been modified post–injury such that instead of driving a truck, he worked in the warehouse where he came and went as he pleased, took breaks as needed, and had a reduced workload. (Tr. 40-41, 188, 197, 267, 276, 287). As part of the work modification agreement, Buckeye Metals continued to pay Plaintiff his pre–injury salary rather than placing him on temporary total disability under the Bureau of Workers' Compensation system. (Tr. 87, 276). Prior to this position, Plaintiff worked for Buckeye Metals as a long haul truck driver. (Tr. 203).

Plaintiff's education was considered "marginal" under the regulations because he stopped attending school after fifth grade. (Tr. 38, 201); 20 C.F.R. § 404.1564. Plaintiff claimed he was unable to work in any capacity because of back pain and spasms, neck pain, carpal tunnel, and mental, educational, and emotional limitations. (Tr. 40-42, 63, 66-67, 202).

With regard to daily activities, Plaintiff cared for his personal needs, cooked, cleaned, shoveled the driveway, shopped for groceries, and used a riding lawnmower. (Tr. 237, 244, 382, 610, 627). Despite reporting pain associated with riding his lawnmower as late as June 29, 2010, Plaintiff testified he had not shopped, performed household chores, or mowed his lawn since approximately October of 2006. (Tr. 65-66, 76, 627).

*Physical Impairments*

Lower Back Injury

On August 11, 2006, the alleged disability onset date, Plaintiff went to the Southwest General Health Center (Southwest) emergency room after suffering a lower back injury while unloading metal from a truck at work. (Tr. 281). The attending physician diagnosed a lumbar sprain and prescribed pain relievers. (Tr. 281). A work status sheet indicated Plaintiff could return to work without limitations in seven days. (Tr. 284).

On August 14, 2006, Plaintiff had a workers' compensation follow–up visit with Daniel Shank, M.D. (Tr. 353). At that visit, Plaintiff's work status sheet was amended to indicate he could return to work on August 15, 2006 with modified duties. (Tr. 354). Specifically, Plaintiff could not lift more than 25 pounds and was restricted from squatting, stooping, or performing safety sensitive functions while on prescribed medication. (Tr. 354).

On August 19, 2006, Victor DeMarco, M.D., performed a lumbosacral procedure. (Tr. 357). Dr. DeMarco's exam was unremarkable aside from a transitional lumbosacral junction. (Tr. 357). Dr. DeMarco directed Plaintiff to attend physical therapy three times per week for four weeks and to wear lumbar support at work. (Tr. 356).

On September 13, 2006, Plaintiff sought treatment from Michael Harris, M.D., for lower back pain. (Tr. 359). Plaintiff alleged trouble sleeping, working, and lifting. (Tr. 359). Dr. Harris indicated Plaintiff's pain was localized to the low lumbosacral region and classified the pain as burning, stabbing, and sharp in nature without radiation. (Tr. 359). A lower back examination revealed flattening of the normal lordotic curvature, tightness in the paraspinals, and a pulling sensation caused by straight leg raising. (Tr. 360). A neurologic examination revealed normal strength, sensation, and reflexes. (Tr. 360). Dr. Harris indicated Plaintiff's range of motion

3

(ROM) was markedly limited in all planes and Plaintiff had experienced spasms. (Tr. 360). He diagnosed a lumbosacral strain and recommended Plaintiff continue with his medication, get a magnetic resonance imaging (MRI) scan of his lower back, and start physical therapy. (Tr. 360).

On October 16, 2006, Dr. Harris noted Plaintiff was doing much better with the help of new medications and rest. (Tr. 348). Plaintiff's pain remained axial in nature, without significant radiation. (Tr. 347). Plaintiff still had limited ROM and tenderness in his lumbar spine, but his straight leg raise test was negative and his neurological examination was normal. (Tr. 347-48).

Plaintiff attended physical therapy two or three times per week from September 26, 2006 through November 17, 2006 for lumbar strain. (Tr. 342, 346). According to Jennifer Stephens, PT, Plaintiff reported a 35 percent reduction in intensity of back pain and a 40 percent reduction in overall symptoms since he started therapy. (Tr. 342, 346). She noted Plaintiff had been compliant with home exercise but his ROM had not significantly improved. (Tr. 346). In her discharge letter to Dr. Harris, she noted Plaintiff's basic mobility was normal, but he was limited to standing for 30 minutes and sitting for one hour. (Tr. 342). Ms. Stephens recommended Plaintiff enroll in a work hardening program. (Tr. 342).

On November 6, 2006, Dr. Harris reviewed Plaintiff's MRI. (Tr. 329). Dr. Harris found no significant canal or foraminal encroachment, well maintained vertebral body, heightened marrow signal, and a mild disc bulge at L4–L5. (Tr. 329).

Over the course of several follow up visits, Dr. Harris reported Plaintiff was doing better and appeared more comfortable. (Tr. 292, 339, 343). Plaintiff's lower back and neurological exams were generally unremarkable, including no evidence of spasm. (Tr. 288, 290, 292, 321, 329, 343, 373, 376, 570, 620-21, 628). Plaintiff frequently exhibited a normal gait, full motor

4

strength, intact sensation, full reflexes, and a negative straight leg test. *Id*. However, he did have tenderness along his lumbosacral junction and right paraspinals, and a limited ROM. *Id*.

On January 25, 2007, Plaintiff visited Kathy Stroh, OTR/L, CHT, OT, for work conditioning therapy. (Tr. 382). Plaintiff complained of pain in his lower back, neck, and elbow. (Tr. 382). He said he had a back brace but it caused him pain, so he did not wear it. (Tr. 382). Plaintiff took Percocet to manage symptoms but indicated he had trouble with difficult or strenuous daily activities, including shoveling the driveway. (Tr. 382). Dr. Stroh concluded lumbar strain, decreased ROM, decreased strength, tender points, decreased functional skills, complaints of pain, and decreased fitness all affected Plaintiff's ability to return to work. (Tr. 384). However, she reported Plaintiff's rehabilitation potential was "good". (Tr. 384). Although there were several more work conditioning visits throughout winter 2007, the record does not include the corresponding progress notes. (Tr. 389, 397, 399, 401-04, 406-09, 411-12, 414).

By March 29, 2007, Plaintiff had returned to work in the warehouse at Buckeye Metals. (Tr. 289). Plaintiff told Dr. Harris he struggled toward the end of the workday and did not do any lifting. (Tr. 289). Dr. Harris recommended Plaintiff continue to work, but to lift no more than 40 pounds occasionally. (Tr. 288, 290).

On May 12, 2007, Plaintiff visited Dr. Shank for a complete exam. (Tr. 456). Dr. Shank did not find any psychiatric, neurologic, or cardiovascular symptoms. (Tr. 457). He indicated Plaintiff's back pain, arthritis, and neck pain had improved with the changes at work and physical therapy. (Tr. 457).

Dr. Shank indicated Plaintiff's back issues were stable on December 14, 2007. (Tr. 459). Although Plaintiff complained of headaches radiating pain into his neck and right shoulder, his physical examination was essentially normal. (Tr. 459-60).

On December 16, 2008, Plaintiff saw Dr. Stephanie Kopey, who was Dr. Harris' resident physician. (Tr. 368). Plaintiff complained of lower back pain, lower rib pain, a tingling sensation in the soles of his feet, and trouble sleeping. (Tr. 368). Plaintiff claimed his pain worsened with movement and after prolonged standing. (Tr. 368). On examination, there was no evidence of spasm or trigger points and Plaintiff had a negative straight leg raise test, but he exhibited tenderness in the lumbosacral region. (Tr. 369). Dr. Kopey reiterated Dr. Harris' recommendation that Plaintiff lift a maximum weight of twenty pounds and work no more than six hours in an eight–hour workday.[1] (Tr. 369).

On September 16, 2008, Dr. Harris reviewed x–rays of Plaintiff's spine, which revealed no evidence of fracture, bone destruction, or dislocation; unremarkable sacral algae; normal sacroiliac joints; and a partial sacralization of L5 on the left side. (Tr. 372). Dr. Harris again recommended Plaintiff lift no more than twenty pounds and work no more than six hours in an eight–hour workday. (Tr. 373). Dr. Harris repeated this recommendation at each of Plaintiff's subsequent appointments. (Tr. 570, 621, 628, 641).

On January 17, 2009, Plaintiff saw Dr. Shank and said his condition had improved with new medication. (Tr. 464). Similarly, on June 18, 2009, Dr. Harris noted Plaintiff had been complying with his treatment regimen and his pain was controlled. (Tr. 569).

On December 22, 2009, Plaintiff went to Dr. Harris and complained of morning stiffness, pain when standing, and occasional flare ups. (Tr. 639). He said these complaints were alleviated with rest. (Tr. 639). Dr. Harris reviewed an x–ray taken at the previous visit, which was unremarkable aside from partial lumbarization of L5 on the left side and mild intervertebral disc

---

1. It is unclear when Dr. Harris first made this recommendation because several of Dr. Harris' treatment records are either illegible or not in the record.

space narrowing at L5–S1. (Tr. 639). Dr. Harris found the x–ray consistent with mild degenerative disc disease. (Tr. 641).

On June 29, 2010, Plaintiff reported his pain was worse when he rode his lawnmower and said he continued to experience tingling in his feet. (Tr. 627). He indicated his pain was tolerable so long as he did not "overdo it". (Tr. 627). Plaintiff's lower back examination was generally unchanged and x–rays taken on June 18, 2010 were unremarkable aside from findings consistent with mild degenerative disc disease. (Tr. 627-28).

On October 5, 2010, Plaintiff presented to Dr. Harris with complaints of throbbing pain in his lower back, radiating pain around his rib cage, and tingling in his thighs and feet. (Tr. 619). Nevertheless, an examination revealed Plaintiff's condition was generally unchanged. (Tr. 620-21). Dr. Harris recommended additional x–rays. (Tr. 621).

Carpal Tunnel Syndrome

On January 25, 2007, Dr. Stroh's examination of Plaintiff's hand was unremarkable. (Tr. 383). However, she noted Plaintiff's complaints of numbness with sustained grip and past problems with lateral epidonylitis. (Tr. 383).

Plaintiff reported neck and right arm pain to Joseph Hanna, M.D., on January 7, 2009. (Tr. 597). Dr. Hanna indicated Plaintiff had full muscle strength and normal sensation with the exception of the C6–7 dermatome. (Tr. 599). He diagnosed cervical spondylosis with myelopathy, neck sprain, and neck strain. (Tr. 600).

On May 8, 2009, Plaintiff returned to Dr. Hanna and reported hand weakness and tingling. (Tr. 490). Plaintiff had full motor strength, except 2/5 strength in his right opponens pollicis, and decreased sensation in the right median distribution. (Tr. 473, 491). Dr. Hanna requested an electromyography (EMG), which was taken on July 14, 2009. (Tr. 496). The EMG

7

revealed right median monoeuropathy at, or distal to, the wrist consistent with moderate to severe right carpal tunnel syndrome, without evidence of ongoing denervation. (Tr. 496). On July 16, 2009, Dr. Hanna notified the bureau of disability determination that Plaintiff had decreased manipulative ability as a result of carpal tunnel syndrome. (Tr. 486).

A follow–up visit with Dr. Hanna on October 17, 2009 was unremarkable. (Tr. 536-38). However, on May 15 and November 20, 2010, Plaintiff returned to Dr. Hanna with complaints of neck and shoulder pain and tingling hands. (Tr. 616, 631). At both visits, Plaintiff had full motor strength in his upper extremities but 4/5 strength in the right opponens pollicis. (Tr. 617, 632). He exhibited decreased sensation and reflexes in his hands and had a decreased arm swing, but had normal coordination and gait. (Tr. 617-18, 631-32). Dr. Hanna diagnosed cervical spondylosis with myelopathy, headache, and carpal tunnel syndrome. (Tr. 633).

Supraventricular Tachycardia

On October 4, 2009, Plaintiff went to the MetroHealth emergency room for chest pain and was converted with adenosine. (Tr. 528, 541). At a follow up visit, Plaintiff revealed he had suffered from supraventricular tachycardia since the age of 24. (Tr. 528). He said he recently suffered more frequent episodes including palpitation, fatigue, and mild chest discomfort. (Tr. 528, 541-42, 549, 553, 558). However, he denied associated shortness of breath, lightheadedness, dizziness, nausea, or dyspnea on exertion. (Tr. 528, 541-42, 549, 553, 558). Plaintiff underwent a radiofrequency ablation procedure without complication. (Tr. 526-34).

State Agency Review

On July 28, 2009, state agency physician Gary Hinzman, M.D., provided a residual functioning capacity (RFC) assessment. (Tr. 512). Dr. Hinzman concluded Plaintiff was capable of performing medium work without frequent stooping. (Tr. 512-18).

W. Jerry McCloud, M.D., provided a second RFC assessment on December 30, 2009, which also indicated Plaintiff could perform a reduced range of medium work. (Tr. 607). Dr. McCloud restricted Plaintiff from frequent stooping or handling and hazards such as machinery and heights. (Tr. 609-10). Dr. McCloud opined Dr. Harris' twenty pound weight restriction was unsupported by the evidence. (Tr. 612).

ALJ Decision

Previously, an ALJ determined Plaintiff had not engaged in SGA from August 11, 2006 through March 31, 2009. (Tr. 16, 18-19). The ALJ in this case accepted that determination but found Plaintiff had engaged in SGA ever since March 31, 2009. (Tr. 19). Accordingly, she found the relevant time period extended from the alleged disability onset date (August 11, 2006) through March 31, 2009.

The ALJ then determined Plaintiff had the following severe impairments: lumbar strain and minimal degenerative disc disease of the lumbar spine; bilateral carpal tunnel syndrome; degenerative disc and joint disease of the cervical spine; and history of supraventricular tachycardia. (Tr. 19). The ALJ determined Plaintiff had the RFC to perform medium work that does not require frequent stooping or handing and avoids concentrated exposure to hazards such as industrial machinery and unprotected heights. (Tr. 22). Without vocational expert (VE) testimony, the ALJ concluded jobs exist in the national economy that Plaintiff could perform. (Tr. 25).

**STANDARD OF REVIEW**

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in

9

the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence, or indeed a preponderance of the evidence, supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for DIB is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five–step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1. Was the claimant engaged in a substantial gainful activity?

2. Did the claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's RFC and can he perform past relevant work?

5. Can the claimant do any other work considering his RFC, age, education, and work experience?

Under this five–step sequential analysis, the claimant has the burden of proof in steps one through four. *Walters*, 127 F.3d at 529. The burden then shifts to the Commissioner at step five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.* The court considers the claimant's RFC, age, education, and past work experience to determine if the claimant could perform other work. *Id.* A claimant is only found disabled if he satisfies each element of the analysis, including inability to do other work, and meets the durational requirements. 20 C.F.R. §§ 404.1520(b)–(f); *see also Walters*, 127 F.3d at 529.

### DISCUSSION

Plaintiff claims the ALJ: 1) did not provide good reasons for rejecting treating physician Dr. Harris' opinion; 2) did not conduct a proper pain and credibility analysis; and 3) failed to obtain VE testimony despite Plaintiff's nonexertional limitations. (Doc. 14, at 8, 10, 13). Each of these arguments is discussed below.

*Treating Physician Rule*

First, Plaintiff claims the ALJ improperly rejected the opinion of his treating physician, Dr. Harris. Although Plaintiff concedes the ALJ provided a basis for rejecting Dr. Harris' opinion, he claims the ALJ failed to support her determination with clinical and objective medical evidence from the record. (Doc. 14, at 9).

Generally, the medical opinions of treating physicians are afforded greater deference than those of non–treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* Social Security Ruling (SSR) 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are

11

generally accorded more weight than those of non–treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

A treating physician's opinion is given "controlling weight" if it is supported by "medically acceptable clinical and laboratory diagnostic techniques and is [consistent] with other substantial evidence in the case record." *Id*. When a treating physician's opinion does not meet these criteria, an ALJ must weigh medical opinions in the record based on certain factors. *Rabbers v. Comm'r Soc. Sec. Admin*., 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id*.

Of importance, the ALJ must give "good reasons" for the assigned weight. *Id*. "Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (quoting SSR 96-2p, 1996 WL 374188, at *4). "Good reasons" are required even when the conclusion of the ALJ may be justified based on the record as a whole. *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004). A failure to follow this procedural requirement "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Id*. (quoting *Rogers*, 486 F.3d at 243).

In this case, the ALJ acknowledged Dr. Harris was a treating physician but she afforded no weight to his opinion that Plaintiff could not lift more than twenty pounds. (Tr. 23-24). The ALJ provided good reasons for her determination because she discussed several of the regulatory

12

factors an ALJ must consider when a treating physician is not given controlling weight. *See* 20 C.F.R. § 404.1527(d)(2).

First, the ALJ noted Dr. Harris' opinion was internally inconsistent. (Tr. 24). In some detail, the ALJ summarized Dr. Harris' conflicting clinical examinations. For example, although Dr. Harris reported Plaintiff's spine had a limited ROM in all planes and exhibited tenderness, the large majority of Dr. Harris' clinical examinations contained insignificant neurological findings without strength limitations. (Tr. 23). Moreover, Dr. Harris consistently found Plaintiff exhibited a negative straight leg raise, did not show any evidence of persistent muscle spasm or muscle atrophy, and had a normal gait. (Tr. 23). Additionally, in Dr. Harris' outpatient records, Plaintiff reported working six–to–eight hours a day despite complaints of lower back pain. (Tr. 23). Each of the ALJ's aforementioned reasons is supported by the record. (Tr. 288, 290, 292, 321, 329, 343, 373, 376, 570, 620-21, 628).

Furthermore, the ALJ concluded Dr. Harris' opinion was inconsistent with the opinion evidence of record. (Tr. 24). As support, the ALJ pointed to the state agency medical consultants' opinion that Plaintiff had the RFC to perform medium work with some nonexertional limitations. (Tr. 24-25, 512-18, 608-611). Additionally, the record demonstrates x–rays, an EMG, and an MRI of Plaintiff's spine revealed mild degenerative changes and no compromise of the neural elements. (Tr. 287, 321, 357, 372, 373, 473, 496, 791, 627, 639). Finally, physical examinations of Plaintiff's lower back consistently contained normal neurological findings, including normal muscle strength. (Tr. 288, 290, 292, 321, 329, 343, 373, 376, 570, 620-21, 628). The ALJ took into consideration Plaintiff's relatively lengthy treatment relationship with Dr. Harris; nevertheless, she rejected Dr. Harris' opinion for the above–stated inconsistencies. (Tr. 23).

In sum, the ALJ adequately considered the regulatory factors, thus she provided good reasons for giving Dr. Harris' opinion no weight. Accordingly, the ALJ's decision to discount Dr. Harris' opinion is supported by substantial evidence and affirmed.

*Credibility*

Plaintiff argues the ALJ failed to properly evaluate his pain and credibility under SSR 96-7. (Doc. 14, at 10). Specifically, Plaintiff claims the ALJ balanced the factors in SSR 96-7, but her decision is "bereft of any real explanation or discussion as to how she balanced these factors." (Doc. 14, at 12).

An "ALJ is not required to accept a claimant's subjective complaints" and may "consider the credibility of a claimant when making a determination of disability." *Jones*, 336 F.3d at 476. An ALJ's credibility determinations about the claimant are to be accorded "great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility.' However, they must also be supported by substantial evidence." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (quoting *Walters*, 127 F.3d at 531); *see also Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004) ("we accord great deference to [the ALJ's] credibility determination."). The Sixth Circuit recently stated an ALJ's credibility findings are "virtually unchallengeable." *Ritchie v. Comm'r of Soc. Sec.*, 2013 U.S. App. LEXIS 20572, at *7, 2013 WL 5496007 (6th Cir. 2013) (quoting *Payne v. Comm'r of Soc. Sec.*, 2010 WL 4810212, at *3 (6th Cir. 2010)).

With this deferential framework in mind, Social Security Ruling 96-7p clarifies how an ALJ must assess the credibility of an individual's statements about pain or other symptoms:

> In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 C.F.R. § 404.1529(c) and § 416.929(c) describe the kinds of evidence, including the factors below, that the adjudicator must consider

14

    in addition to the objective medical evidence when assessing the credibility of an individual's statements:

    1. The individual's daily activities;

    2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

    3. Factors that precipitate and aggravate the symptoms;

    4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

    5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

    6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

    7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3. An ALJ is not required, however, to discuss each factor in every case. *See Bowman v. Chater*, 1997 WL 764419, at *4 (6th Cir. 1997); *Caley v. Astrue*, 2012 WL 1970250, *13 (N.D. Ohio 2012).

    Here, the ALJ "considered the criteria of [SSR] 96-7p and the symptom regulations as they pertain to [Plaintiff's] self–described degree and chronicity of symptoms; self–described functional limitations; and, self–described reduced activities of daily living." (Tr. 24). However, the ALJ continued, "there [were] factors that negate giving [Plaintiff] full credibility as to the extent of his representations." (Tr. 24).

    First, the ALJ noted Plaintiff's allegations of disabling symptoms and functional limitations were not reasonably consistent with objective medical evidence. (Tr. 24). As support, the ALJ pointed to Plaintiff's MRI, x–rays, and EMG study, all of which were inconsistent with Plaintiff's allegations of debilitating pain. (Tr. 23). Indeed, Dr. DeMarco examined Plaintiff days

15

after his injury, yet found the examination to be unremarkable aside from a transitional lumbosacral junction. (Tr. 356). Dr. Harris reviewed several x–rays and an MRI on at least four different occasions, yet generally found unremarkable results. (Tr. 329, 372, 627-28, 641). Dr. Harris did not change his functional limitation opinion even amid Plaintiff's complaints that his condition had worsened, suggesting he did not find objective evidence to support Plaintiff's subjective complaints. (Tr. 641).

The ALJ also described inconsistencies between Plaintiff's allegations and the conservative nature of his treatment. (Tr. 24). Specifically, the ALJ pointed to Plaintiff's lack of hospitalization or unscheduled doctor visits, infrequent and well–spaced outpatient programs, and limited physical therapy and work hardening program treatments. (Tr. 24). To this end, Plaintiff's physical therapy was approximately limited to two months in 2006 and his work hardening program was approximately limited to a six–month span in 2007. (Tr. 342, 346, 382, 389, 397, 399, 401, 402-04, 406-09, 411-12, 414). Furthermore, Plaintiff often went several months without receiving any medical treatment and there is considerable evidence in the record suggesting Plaintiff's condition had improved. (Tr. 229, 339, 343, 347-48, 459, 464, 627).

Additionally, the ALJ considered the opinion evidence of record.  For the reasons previously discussed herein, the ALJ discredited Dr. Harris' functional limitation opinion, instead adopting the opinions of the state agency examiners, whose findings did not support Plaintiff's allegations of debilitating pain. (Tr. 24). Finally, the ALJ considered Plaintiff's effort to deceive the Ohio workers' compensation system with his former employer as having an adverse impact on his credibility. (Tr. 19).

In sum, the ALJ's credibility determination is supported by substantial evidence; namely, the objective medical record, conservative treatment regimen, and opinion evidence. There is no

"compelling" reason to disturb the ALJ's finding, thus, her credibility determination is affirmed. *See Ritchie*, 2013 U.S. App. LEXIS 20572, at *7.

*Nonexertional Impairments and the Grids*

Plaintiff argues the ALJ should have consulted a VE to testify whether Plaintiff's nonexertional impairments reduced his ability to perform medium work. (Doc. 14, at 13).

Once an ALJ has determined a claimant cannot perform his past relevant work, the burden shifts to the Commissioner at step five to show there are significant numbers of other jobs in the economy that he can perform and which are consistent with his RFC, age, education, and work experience. *Cole v. Sec'y of Health & Human Servs.*, 820 F.2d 768, 771 (6th Cir. 1987). One way the Commissioner may satisfy this burden is through reference to the Medical–Vocational Guidelines, also referred to as the "grids", which dictate a finding of "disabled" or "not disabled" based on the claimant's exertional limitations, age, education, and prior work experience.[2] *Id*.; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981). The grids are a shortcut to eliminate the need for calling a VE. *Hurt v. Secretary of Health and Human Servs.*, 816 F.2d 1141, 1143 (6th Cir. 1987).

However, the grids specifically disclaim an ability to predict disability when nonexertional limitations restrict a claimant's performance of a full range of work at a given RFC level. 20 C.F.R. § 404.1569a(d); *Kirk*, 667 F.2d at 528-29. Therefore, in the event a claimant's nonexertional limitations prevent him from performing the full range of work at a designated RFC level, the ALJ may not rely on the grids and must come forward with other

---

2. Exertional limitations affect a claimant's ability to meet the strength demands of jobs (i.e., sitting, standing, lifting, carrying, pushing, or pulling), and nonexertional limitations affect a claimant's ability to meet the non-strength demands of jobs (i.e., maintaining attention, understanding, seeing or hearing, tolerating physical features of certain work settings, stooping, climbing, or difficulty functioning due to nervousness, anxiousness, or depression). 20 C.F.R. §§ 404.1569a(b), (c).

"reliable evidence" to prove a significant number of jobs exist, which claimant can perform despite his exertional and nonexertional limitations. *Shelman v. Heckler*, 821 F.2d 316, 321-22 (6th Cir. 2009) (claimant's sensitivity to environmental contaminants precludes rote application of the grids); *see also Hurt*, 816 F.2d at 1143 (claimant's manipulative restrictions preclude rote application of the grids). In the Sixth Circuit, "reliable evidence" includes VE testimony. *Brown v. Comm'r of Soc. Sec.*, 1 Fed.Appx. 445, 449 (6th Cir. 2001). Indeed, sole reliance on the grids to make a determination of not disabled is inappropriate where a plaintiff's RFC is limited by nonexertional impairments. *Santilli v. Astrue*, 2012 WL 609382, *3 (N.D. Ohio 2012); *Allison v. Apfel*, 2000 WL 1276950, at *3 (6th Cir. 2000), *aff'd*, 229 F.3d 1150.

Here, Plaintiff's RFC included nonexertional limitations related to stooping, handling, and concentrated exposure to hazards. (Tr. 22). Despite these nonexertional limitations, the ALJ did not take VE testimony, and instead relied solely on the grids and a citation to SSR 85-15. (Tr. 26). However, neither the grids (which consider only exertional limitations), nor SSR 85-15 (which considers only nonexertional limitations) apply to Plaintiff, who suffers from both exertional and nonexertional limitations. *See Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 424 (6th Cir. 2008); SSR 85-15, 1985 WL 56857. Thus, the Commissioner failed to carry her burden, rendering her decision unsupported by substantial evidence. *Shelman*, 821 F.2d at 321-22.

Generally, this type of error has not been found harmless. *See, e.g., Hammons v. Astrue*, 2010 WL 58913 (E.D. Ky. 2010) (remanding where the ALJ incorporated nonexertional impairments into the claimant's RFC but relied solely on the grids to meet the Commissioner's burden at step five); *Shelman*, 821 F.2d at 322 (same); *Demogola v. Comm'r of Soc. Sec.*, 2012 WL 1094659 (W.D. Mich. 2012) (same); *Anthony v. Comm'r of Soc. Sec.*, 2012 WL 4483790 (N.D. Ohio 2012) (same); *Rhone v. Astrue*, 2012 WL 3637647 (N.D. Ohio 2012) *report and*

*recommendation adopted*, 2012 WL 3637244 (N.D. Ohio 2012) (same); *Ridge v. Barnhart*, 232 F. Supp. 2d 775, 793 (N.D. Ohio 2002) (same).

Accordingly, the Court remands the instant case so the ALJ can obtain VE testimony or provide other reliable evidence showing Plaintiff can perform jobs in the national economy considering his RFC, age, education, and prior work experience.

## CONCLUSION

Following review of the arguments presented, the record, and applicable law, the Commissioner's determinations regarding credibility and the weight afforded to Dr. Harris are affirmed. However, the Court finds the ALJ's decision unsupported by substantial evidence to the extent the Commissioner did not put forth VE testimony or other reliable evidence to satisfy her burden at step five of the five step sequential evaluation. Accordingly, the Commissioner's decision denying benefits is reversed, and the case is remanded to the Commissioner under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

IT IS SO ORDERED.

  s/James R. Knepp II
United States Magistrate Judge

19